UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

ROBERT F. LUEPKER, JR.,        )
                               )
            Plaintiff,         )
                               )
       vs.                     )        No. 4:09CV1657-DJS
                               )
UNKNOWN TAYLOR, et al.,        )
                               )
            Defendants.        )

ORDER

This matter is before the Court on defendants' motion to dismiss or in the alternative for summary judgment [Doc. #17]. Defendants' motions to strike [Docs. #25, 27, 34] documents submitted by plaintiff in opposition to the motion for summary judgment are also before the Court. These motions are now ripe for disposition.

Background

Pro se plaintiff Robert F. Luepker, Jr. filed this 42 U.S.C. § 1983 action on October 2, 2009, alleging a violation of his civil rights by four members of the St. Louis County Police Department, Officers Matthew Taylor, Lucas Donaldson, Jonathan Armbrister,[1] and Nicholas Nazzoli (collectively "defendants"). The lawsuit arises out of an incident that occurred on August 17, 2006 in the back of an ambulance in the parking lot of a 7-Eleven

---

[1]This defendant has been referred to at various times as "Armbruster" and "Armbrister." In the most recent pleadings, both parties seem to have settled on Armbrister.

convenience store.  Plaintiff had overdosed on fentanyl and heroin and was unconscious.  With paramedics working to save his life, he was revived from his comatose state but was uncontrollable and striking the paramedics.  The paramedics requested the assistance of defendants in subduing plaintiff.  Plaintiff alleges that, at that point, defendants used excessive force against him causing physical injuries.  He seeks compensation for his resulting $1,093.00 medical bill, compensation for his pain and suffering, and an order requiring defendants to complete a victims compassion course.

Defendants responded to plaintiff's pro se complaint by filing a motion to dismiss with outside evidence attached, requiring the Court to treat the motion like a motion for summary judgment.  <u>See</u> Fed. R. Civ. P. 12(d).  Plaintiff responded to defendants' motion by submitting affidavits in opposition. Defendants moved to strike some of the evidence presented in those affidavits.  The Court will first resolve the motions to strike to clarify the evidentiary record and then proceed to analyze the motion for summary judgment.

## I.  Motions to Strike

The first of defendants' three motions to strike concerns plaintiff's affidavit and his rebuttal to defendants' statement of uncontroverted facts.  In his affidavit and his rebuttal to defendants' statement of facts, plaintiff testifies regarding the

entire scope of the events at issue, including times when he admits he was unconscious, having seizures, or in a state of bewilderment. Defendants argue that the Court should strike these documents because plaintiff does not have personal knowledge of the matters stated.

Federal Rule of Civil Procedure 56(e) requires affidavits submitted upon a motion for summary judgment to be made on personal knowledge and to show that the affiant is competent to testify on the matters stated. Fed. R. Civ. P. 56(e). Courts are not permitted to consider affidavits that do not comply with Rule 56(e). El Deeb v. Univ. of Minn., 60 F.3d 423, 428-29 (8th Cir. 1995). "Where an affidavit does not meet this standard, it is subject to a motion to strike." McSpadden v. Mullins, 456 F.2d 428, 430 (8th Cir. 1972).

It is well-settled that "[p]arties to a motion for summary judgment cannot create sham issues of fact in an effort to defeat summary judgment." Am. Airlines, Inc. v. KLM Royal Dutch Airlines, Inc., 114 F.3d 108, 111 (8th Cir. 1997). Consequently,

> a party should not be allowed to create issues of credibility by contradicting his own earlier testimony. Ambiguities and even conflicts in a deponent's testimony are generally matters for the jury to sort out, but a district court may grant summary judgment where a party's sudden and unexplained revision of testimony creates an issue of fact where none existed before. Otherwise, any party could head off a summary judgment motion by supplanting previous depositions ad hoc with a new affidavit, and no case would ever be appropriate for summary judgment.

Wilson v. Westinghouse Elec. Corp., 838 F.2d 286, 289 (8th Cir.
1988) (internal citations and quotation marks omitted). When the
affiant needs to explain portions of his prior testimony that were
unclear or when the affiant's affidavit does not actually
contradict his earlier testimony, the district court should not
strike the affidavit from the record. City of St. Joseph, Mo. v.
Sw. Bell Telephone, 439 F.3d 468, 476 (8th Cir. 2006).

Plaintiff's complaint is dated and signed under penalty
of perjury, and therefore satisfies the requirements of a verified
complaint. 28 U.S.C. § 1746. A verified complaint is the
equivalent of an affidavit for summary judgment purposes. Williams
v. Adams, 935 F.2d 960, 961 (8th Cir. 1991). Plaintiff's complaint
contains the following sworn statements: (1) "Luepker was
incoherent during most of the assault but does recall the continued
battery and some snide remarks — even after the police subdued him
inside the ambulance"; (2) "Officer Taylor claimed Luepker
assaulted him by striking his left arm after Luepker had been
administered Narcan, yet was still incoherent from the heroin
overdose but does remember the feeling of fighting for his life";
(3) "Luepker regained physical consciousness after Paramedic,
Bertino administered the Narcan shot to his neck but did not become
consciously coherent until a short time later"; (4) "The trauma of
the revival from the Narcan shot after the overdose caused Luepker
to be confused, and while still incoherent appeared combative,

while he was only trying to regain consciousness"; (5) "Luepker remembers gaining coherency about the time he was hogtied on his stomach, eyes burning and choking from the spray of the OC cannister to his eyes and mouth, begging not to be tased anymore, while his head was being stomped into the floor of the ambulance as he prayed out loud"; and (6) "While still incoherent, Luepker seems to have suffered from cardiac arrest as he experienced seizure like symptoms from the combination of the drug overdose, Narcan shot, OC spray, continuous tasering, and battery which sent Luepker in convulsions." Doc. #1, pp. 6-8. Thus, plaintiff admits under oath in his verified complaint that he did not regain coherency until after he had been pepper sprayed, tasered, hog-tied, and pinned to the floor of the ambulance.

In his affidavit filed in opposition to summary judgment, plaintiff claims to recall the sequence of events occurring immediately upon his being revived with Narcan. The affidavit states: (1) "Affiant regained consciousness after being administered a Narcan shot by paramedics"; (2) "Affiant experienced seizure like symptoms after regaining consciousness from the drug overdose and compelled Officer Taylor to enter the ambulance upon request from the paramedics, and force Affiant, as a patient under medical care to submit from communicating and [sic] kind of survival instincts while recuperating from a bout with death"; (3) "It must be made clear; Affiant regained consciousness, yet was in a convulsive state. Bewilderment after a near-death, comatose state

is natural, and was never taken into consideration or expressed by paramedics or police officers"; (4) "Officer Taylor continued to aggravate the situation by deploying his OC canister inside an ambulance and spraying Affiant with pepper spray in the eyes and mouth, sending Affiant into worse convulsions"; (5) "Affiant's recovery was then hindered further as Officer Armbrister and Nazzoli entered the ambulance and commanded Affiant to lie still, who was at that time in a convulsive state, praying out loud"; (6) "Officers Taylor, Armbrister, and Nazzoli then consorted [sic] to physically and mentally taunt Affiant with physical and verbal assaults, as Officer Taylor rendered several blows to Affiant with his baton, while Affiant was only trying to regain his motor skills from the combination of the pre-existing medical conditions, spray bursts of pepper mace, and continuous blows from the officers"; (7) "Affiant was afflicted by the officer, and the pain and anguish was so severe it rendered the Affiant in and out of consciousness"; (8) "Affiant does not remember if he was constrained by the three [ ] Officers: Taylor, Armbrister, and Nazzoli, or if it was after Officer Donald entered the ambulance. Affiant does in fact clearly recall being tased several times after he was constrained and hog-tied"; (9) "At this point there are 5 or 6 'professional' adults inside the ambulance: Paramedics/Firefighters Lou Chiodini and Dan Bertino and Officers Taylor, Armbrister, Nazzoli, and possibly Donaldson. The officers constrained the 160 lb. Affiant with brute force knocking him to the floor of the ambulance. They worked

together to handcuff and hog-tie the seizured Affiant, by placing a strap through the ankle loop, through the handcuffs, and around the sternum of the Affiant (Exhibit G), causing the Affiant to be choked at the slightest movement, while imobilized [sic] on his stomach"; (10) "The brutality and tasering continued even after the Affiant was completely subdued"; (11) "Affiant at this point was still chanting and praying out loud as the torment persisted. Then someone in the ambulance yelled, "Shut up!" And Affiant felt continuous voltage surge throughout his body, sending him back into convulsions, and to pray all the louder"; (12) "Affiant recalls the voltage start and stop about seven to eight times (Exhibit B & D) as he was assaulted"; (13) "The tasering apparently happened after the fourth police officer, Donaldson entered the ambulance (according to the St. Louis County Police Department's Investigative Report, prepared by Officer Taylor)"; (14) "The torture of the on and off tasering continued while Affiant was immobilized, hog-tied on his stomach, as one or more of the officers, kicked Affiant in the back of the head, face, mouth, and body, causing lacerations to the shoulders, left brow, and lip, and contusions to the left eye and body"; (15) "Affiant was devastated at this point, but clearly recollects one of the persons who was standing over him attacking him say, 'Man, this guy just won't die.' Affiant, all the while continued to chant and pray to God out loud in fear for his life"; (16) "The affliction only subsided after Affiant heard an individual in the ambulance say

7

remorsefully, 'This is him?'  Apparently the individual was looking at the Missouri Driver's License photo of Affiant wearing a tie, and then moments later Affiant felt his wallet drop on the small of his back"; and (17) "A traumatized Affiant was then released from being hog-tied but was left with the leg restraint around his ankles, and placed back on the stretcher, then strapped and handcuffed to it."

The Court finds that plaintiff's affidavit conflicts with his sworn statements in his complaint and that plaintiff is not merely attempting to explain an unclear portion of prior testimony. Plaintiff swears in his complaint that he did not regain coherency until after he was pepper sprayed, tasered, hog-tied, and pinned to the floor of the ambulance.  In his affidavit, on the other hand, he claims that he was conscious and coherent, although suffering from seizures and convulsions, for the entire incident after he was revived with Narcan.  The affidavit is irreconcilable with the verified complaint in this respect.  At first, plaintiff swore that he regained coherency only after he had been tasered, but when faced with summary judgment, plaintiff swears that he recalls being tasered several times after he was subdued and handcuffed.  Because testimony must be based on personal knowledge, because plaintiff admits in his complaint that he was not coherent until after he was hog-tied and tasered, and because his affidavit contradicts his sworn statements from his complaint, the Court will strike from the affidavit all statements concerning the events that occurred prior

to the point he swears that he regained coherency in his verified complaint.

Defendants' second motion to strike concerns the photographs plaintiff submitted in his response to the motion for summary judgment. Defendants argue that the Court should strike these photographs because plaintiff failed to lay a proper foundation. In response to defendants' second motion to strike, plaintiff requested leave from the Court, pursuant to Federal Rule of Civil Procedure 56(f), for additional time to obtain evidence to oppose defendants' motion for summary judgment. Specifically, he sought affidavits from three individuals to lay the proper foundation for the photographs. The Court granted plaintiff this additional time, and plaintiff later submitted his own affidavit and the affidavits of Christine Hernandez, Michele Rosner, and Edward Rosner. Hernandez and the Rosners testify regarding the injuries they observed upon plaintiff's release from jail. Hernandez further testifies that she took the pictures that plaintiff submitted as exhibits in this case. Defendants then filed a third motion to strike, arguing that the affidavits of Hernandez and the Rosners should be struck to the extent the affidavits testify as to the origin of plaintiff's injuries because such testimony is not based on their personal knowledge.

Because plaintiff's affidavits submitted in response to defendants' second motion to strike demonstrate that the photographs were taken the day after the incident and portray the

injuries alleged by plaintiff, the Court is satisfied a proper foundation has been laid to admit the photographs.  Accordingly, the Court will deny defendants' second motion to strike.

Because Hernandez and the Rosners were not present when plaintiff's injuries were sustained, they do not have personal knowledge of how those injuries were caused.  Thus, the Court will grant defendants' third motion to strike to the extent those affiants testify regarding the cause of plaintiff's injuries.

## II.  Motion for Summary Judgment

In their motion for summary judgment, defendants argue that no reasonable jury could find that defendants used excessive force against plaintiff, given the undisputed facts.  Plaintiff responds that summary judgment is not proper because a genuine issue for trial exists as to whether defendants used excessive force.

## A.  Standard of Review

As an initial matter, the Court notes that plaintiff is a pro se litigant, and as such his pleadings are held "'to less stringent standards than formal pleadings drafted by lawyers.'" Ellis v. Butler, 890 F.2d 1001, 1003 (8th Cir. 1989) (quoting Haines v. Kerner, 404 U.S. 519, 520 (1972)).  Nevertheless, plaintiff must comply with substantive and procedural law.  See Am. Inmate Paralegal Ass'n v. Cline, 859 F.2d 59, 61 (8th Cir. 1988).

In considering a motion for summary judgment, the Court will "view all of the evidence in the light most favorable to the nonmoving party and [will] give that party the benefit of all reasonable inferences to be drawn from the facts disclosed in the pleadings." Reich v. ConAgra, Inc., 987 F.2d 1357, 1359 (8th Cir. 1993). "Summary judgment is appropriate if there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law." Id. "Where the unresolved issues are primarily legal rather than factual, summary judgment is particularly appropriate." Mansker v. TMG Life Ins. Co., 54 F.3d 1322, 1326 (8th Cir. 1995).

**B.   Facts**

The following facts are those the Court finds are undisputed for purposes of this motion, including those facts from defendants' statement of uncontroverted facts that are deemed admitted because plaintiff failed to controvert them with competent evidence. See E.D.Mo. L.R. 4.01. To the extent the facts are in dispute, the following recitation of the facts accepts plaintiff's version as true.

On the evening of August 17, 2006, plaintiff overdosed on a combination of fentanyl and heroin. He was transported by a companion to a 7-Eleven convenience store in St. Louis County, Missouri. Affton, Missouri Ambulance #1117 was present on the scene. Paramedic-Firefighters Lou Chiodini and Dan Bertino

(collectively "paramedics") took plaintiff into the back of the ambulance and placed him on a stretcher. Plaintiff was not breathing and was in a comatose state.

Defendant Taylor was also present at the scene. He had responded to a call of a sick person at the 7-Eleven. When he arrived, he found Affton Fire Chief Ken Westbrook standing outside of the ambulance. Westbrook told defendant Taylor that plaintiff had apparently overdosed on heroin. Defendant Taylor spoke to the paramedics and offered to provide whatever assistance they might need. At that time, plaintiff remained unconscious on the stretcher, secured by three straps. Defendant Taylor closed the ambulance doors and stationed himself outside.

In order to counteract the heroin overdose, the paramedics were attempting to administer Narcan intravenously. Bertino was able to locate a vein in plaintiff's neck, so he inserted the IV needle. Chiodini then started the flow of Narcan. Within seconds of the Narcan entering plaintiff's system, he was revived, unstrapped himself, and immediately began swinging his arms about, striking the paramedics. Chiodini called for help from defendant Taylor. While plaintiff was thrashing about, he injured his left eye by striking it on the stretcher.

When defendant Taylor entered the ambulance, he told plaintiff to lie down so that the paramedics could render plaintiff assistance. The IV line had been disconnected from plaintiff due to his movements. Plaintiff continued to flail his arms around,

striking the paramedics and Taylor. Plaintiff was also yelling and speaking words that were incoherent. Defendant Taylor informed plaintiff that he was under arrest, but he continued to swing his arms and yell incoherently. In an attempt to subdue plaintiff, defendant Taylor deployed his pepper spray, administering two one-second bursts into plaintiff's eyes and mouth. Plaintiff became more combative, swinging his arms and fists about and striking the occupants of the ambulance several times. Defendant Taylor put out a call for a supervisor and a CIT officer equipped with a taser. While defendant Taylor was waiting for these officers to respond, plaintiff's behavior became even more violent, so defendant Taylor activated his emergency alert tone for more officers to respond.

Shortly thereafter, defendants Armbrister and Nazzoli appeared on the scene, entered the ambulance, and attempted to handcuff plaintiff. They commanded plaintiff to place his hands behind his back so that he could be handcuffed. Plaintiff continued to resist arrest. In an attempt to stop plaintiff's resistance, defendant Taylor struck plaintiff on the back of his right calf muscle with his baton, but plaintiff's resistance continued.

After defendants Armbrister and Nazzoli were unsuccessful in restraining plaintiff, defendant Donaldson appeared on the scene and entered the ambulance. He instructed plaintiff to stop his resistance and to put his hands behind his back so that he could be handcuffed. Defendant Donaldson told plaintiff that if he did not

cease resistance he would be shocked with a taser. When plaintiff's resistance did not cease, defendant Donaldson deployed his department issued taser, placed it against plaintiff's right side, and yelled "Taser, taser, taser." Defendant Donaldson then activated the taser for a five-second jolt. The shock from the taser caused plaintiff's resistance to cease, and defendants worked together to handcuff and "hog-tie" plaintiff by running a strap around his ankle restraints, through his handcuffs, and around his chest. He was placed on his stomach. This arrangement caused plaintiff to be choked at the slightest movement.

Plaintiff recalls regaining coherency around this time, after he had been pepper sprayed, tasered, hog-tied, and placed on his stomach. Plaintiff recalls one of the persons in the ambulance saying "Man, this guy just won't die," while plaintiff continued to chant and pray out loud in fear for his life. Plaintiff recalls that the situation subsided after he heard someone in the ambulance say remorsefully, "This is him?" while looking at plaintiff's driver's license photograph. Plaintiff then felt his wallet drop onto the small of his back.

Plaintiff was then released from being hog-tied but kept in ankle restraints. He was placed back on the stretcher and strapped and handcuffed to it. He was taken to St. Anthony's Hospital for treatment, where the hospital's diagnosis of him was "combative after Narcan." In addition to being treated for the heroin overdose, the hospital provided treatment for plaintiff's

pepper mace ingestion, thoroughly examined him for broken bones, and administered aid for lacerations and contusions. Plaintiff incurred a $1,093.00 medical bill from the hospital.

Upon release from the hospital, plaintiff was transported to St. Louis County Jail Intake Center and charged with three counts of assault. The prosecution later decided not to pursue the charges because plaintiff began serving a substantial sentence in a federal prison in West Virginia, where he currently resides.

Plaintiff was picked up from jail by his mother, Michelle Rosner, and his stepfather, Edward Rosner. They observed that he had a blackened left eye, a cut above his eye brow, a swollen lower lip, bruising to both wrists, and burns on his legs. The Rosners took plaintiff to Christine Hernandez's home, where they took pictures of plaintiff's injuries. The pictures show plaintiff's swollen lower lip, a bruise on his neck from where the Narcan IV was administered, redness on his wrist, and circular redness on his thigh from where the taser made contact with his skin.

C. **Discussion**

In addressing an excessive force claim brought under § 1983, the analysis begins by identifying the specific constitutional right allegedly violated by the challenged application of force. <u>Graham v. Connor</u>, 490 U.S. 386, 394 (1989). Claims, like plaintiff's, that law enforcement officers have used

excessive force in the course of an arrest of a free citizen are analyzed under the Fourth Amendment. Id. at 395.

The Fourth Amendment guarantees citizens the right "to be secure in their persons ... against unreasonable ... seizures" of the person. Id. at 394. "Determining whether the force used to effect a particular seizure is 'reasonable' under the Fourth Amendment requires a careful balancing of 'the nature and quality of the intrusion on the individual's Fourth Amendment interests' against the countervailing governmental interests at stake." Id. at 396 (quoting Tennessee v. Garner, 471 U.S. 1, 8 (1985)). The Supreme Court has long recognized that the right to make an arrest carries with it the right to use some degree of physical coercion or threat thereof to effect it. Id. (citing Terry v. Ohio, 392 U.S. 1, 22-27 (1968)). The Supreme Court has stated that:

> Because "[t]he test of reasonableness under the Fourth Amendment is not capable of precise definition or mechanical application," however, its proper application requires careful attention to the facts and circumstances of each particular case, including the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight.

Id. (quoting Bell v. Wolfish, 441 U.S. 520, 559 (1979)). The Eighth Circuit has indicated that, in addition to the circumstances surrounding the use of force, the Court may also consider the result of the force, i.e., the extent of the injuries, when deciding whether the force was reasonable. Crumley v. City of St. Paul, Minn., 324 F.3d 1003, 1007-08 (8th Cir. 2003) (holding that,

16

as a matter of law, plaintiff's injuries were too minor to support an excessive force claim); Foster v. Metro. Airports Comm'n, 914 F.2d 1076, 1082 (8th Cir. 1990) (holding that allegations of pain without some evidence of a more permanent injury are not sufficient to support a claim of excessive force); see also Greiner v. City of Champlin, 27 F.3d 1346, 1355 (8th Cir. 1994) (reasoning that the lack, or minor degree, of an injury is relevant in determining the reasonableness of the force used to effect an arrest).  Various courts have determined that the use of a taser or stun gun is reasonable in response to a person resisting arrest, particularly when it is used in "stun" mode, as in this case, as opposed to "dart" mode.  See Brooks v. City of Seattle, 599 F.3d 1018, 1026-31 (9th Cir. 2010).

"The 'reasonableness of a particular use of force must be judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight." Graham, 490 U.S. at 394.  "Not every push or shove, even if it may later seem unnecessary in the peace of a judge's chambers, violates the Fourth Amendment." Id. (internal quotation omitted).  "The calculus of reasonableness must embody allowance for the fact that police officers are often forced to make split-second judgments—in circumstances that are tense, uncertain, and rapidly evolving—about the amount of force that is necessary in a particular situation." Id. at 396-97.  Thus, the reasonableness inquiry in an excessive force case is an objective test: "the question is whether the

officers' actions are 'objectively reasonable' in light of the facts and circumstances confronting them, without regard to their underlying intent or motivation." Id. at 397. In light of the objective nature of the test, "[a]n officer's evil intentions will not make a Fourth Amendment violation out of an objectively reasonable use of force." Id.

Combining these principles with the summary judgment standard, the Court must consider whether the evidence, viewed in a light most favorable to plaintiff, raises any genuine dispute as to the reasonableness of the force used. If the evidence, viewed in a light most favorable to plaintiff, is such that a reasonable jury could return a verdict in his favor, summary judgment is not proper. See Foster, 914 F.2d at 1081 (citing Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986)).

Using the test described in Graham v. Connor, 490 U.S. 386 (1989), the Court will address whether defendants' uses of force against plaintiff were reasonable. The force used included pepper spray, a police baton, a taser, and a hog-tie restraint technique. Defendants assert that these uses of force were in response to plaintiff becoming violent and resisting arrest after being revived from his drug overdose. Plaintiff does not deny that he repeatedly struck the paramedics and defendants. Indeed, although he attempts to characterize his movements as "convulsions" and "seizures" rather than violent resistance, plaintiff admits that he was not consciously aware of his actions and thus has no

competent evidence to refute the sworn statements of the paramedics and defendants.

With regard to the crime at issue at the time of the arrest (the first <u>Graham</u> factor), plaintiff was striking the paramedics and police officers as they tried to subdue him, for which he was charged with three counts of assault. While these charges were later dropped because of plaintiff's substantial federal prison sentence in an unrelated case, the crime at issue when defendants were attempting to make the arrest was assault, which is a violent crime.

With regard to the danger posed by plaintiff (the second <u>Graham</u> factor), whether his strikes were intentional or not, plaintiff presented a danger to the paramedics, the officers, and even himself. Furthermore, considering the location of this incident, the confined space of the back of an ambulance, the paramedics and police officers had little room to avoid the danger of plaintiff's flailing extremities. The Court also recognizes that the paramedics and officers were aware that plaintiff was in grave medical danger due to his drug overdose, such that, for plaintiff's own benefit, he needed to be restrained as quickly as possible so that the paramedics could attend to him. These are exactly the kind of "tense, uncertain, and rapidly evolving" circumstances that must be taken in to consideration in assessing the reasonableness of defendants' use of force. <u>See</u> <u>Graham</u>, 490 U.S. at 396-97.

19

With regard to whether plaintiff was resisting or attempting to evade arrest (the final Graham factor), plaintiff was resisting arrest at the time the force was used. Plaintiff's flailing about resisted defendants' efforts to subdue and arrest him, and whether he consciously intended to flail about is irrelevant. See Holtgreven v. O'Fallon Police Dept., No. 408CV553-ERW, 2009 WL 2032164 at *9 (E.D. Mo. July 8, 2009) (finding that plaintiff was resisting arrest even though his actions were the result of diabetic shock).

With regard to the injuries sustained from the uses of force, plaintiff merely alleges pain, discomfort, bruises, and minor burns. He does not allege any permanent or serious injuries. The lack of any permanent or serious injury supports defendants' argument that the force used was reasonable. See Wertish v. Krueger, 433 F.3d 1062, 1067 (8th Cir. 2006) (finding that "minor scrapes and bruises and less-than-permanent aggravation of a prior shoulder condition were de minimis injuries that support the conclusion that [the officer] did not use excessive force" by forcibly taking plaintiff to ground, striking plaintiff in the back of the head with his elbow, hitting plaintiff in the ribs with his knee, and pushing plaintiff against a truck, when plaintiff appeared to be a belligerent drunk, resisting arrest, but was actually suffering from diabetic shock); Crumley, 324 F.3d at 1007-08; Foster, 914 F.2d at 1082. Furthermore, the Court does not believe that the momentary pain and suffering caused by a taser in

stun mode used against a person who was admittedly under the influence of an overdose of two powerful opiates (pain killers) and admittedly incoherent at the time the taser was deployed rises above the level of a de minimis injury discussed in Wertish.

Under these circumstances and construing the competent evidence in a light most favorable to plaintiff, the Court finds that defendants' use of force in using pepper spray, a baton, a taser, and a hog-tie restraint technique were objectively reasonable, and no juror could reasonably find otherwise. See Foster, 914 F.3d at 1082 (resistance justified use of force); Agee v. Hickman, 490 F.2d 210, 212 (8th Cir. 1974) (per curiam) (force can be used to overcome physical resistance or threatened force). As described above, plaintiff was being arrested for a violent crime, was a danger to all of the occupants of the ambulance, including himself, and was resisting arrest, and the actual injuries plaintiff sustained were not serious or permanent. Defendants only used the taser in stun mode and only to the extent required to bring plaintiff under control, and in this instance, it can be said that the taser and other force used against plaintiff helped plaintiff more than it harmed him because the force caused plaintiff to submit to the medical care he needed. Thus, the Court finds that the force used against plaintiff was objectively reasonable as a matter of law.

The Court's conclusion that the force used in this case was reasonable is consistent with recent Eighth Circuit precedent.

In <u>Cook v. City of Bella Villa</u>, 582 F.3d 840 (2009), the plaintiffs, husband and wife, brought excessive force claims against a police officer after he used a taser and physical force to affect their arrests during a traffic stop. <u>Id.</u> at 848-53. In that case, the officer and the wife were outside of the car, and the officer was questioning her regarding whether she was intoxicated while driving. The husband stepped out of the vehicle to confront the officer when he saw what he believed to be the officer inappropriately touching his wife. He began yelling at the officer and took one step towards him. The officer instructed him to get back in the car and simultaneously tased him using the dart mode of his taser. After placing the wife in the patrol car, the officer instructed the husband to get in the patrol car, but when the husband had difficulty getting in the vehicle, the officer pushed him in, hitting the husband's head on the door. <u>Id.</u> at 845-47. The Eighth Circuit upheld the granting of summary judgment on the husband's excessive force claim. <u>Id.</u> at 851. The court noted that the husband's only injuries were minor scrapes and two taser puncture marks which did not require medical treatment. <u>Id.</u> at 850. The court reasoned that the force was reasonable under the circumstances because the officer was alone on a highway at midnight and attempting to arrest an uncooperative driver while the husband and another passenger were hysterically shouting at him. <u>Id.</u> at 850-51.

A recent Eighth Circuit decision finding the reasonableness of the use of a taser to be a question of fact is also instructive here. In <u>Brown v. City of Golden Valley</u>, 574 F.3d 491 (8th Cir. 2009), a police officer stopped a car along a highway. <u>Id.</u> at 494. The male driver began to exit the vehicle, but the officer ordered him to get back in the car. The driver complied. Three officers approached the driver's window, asked if he knew why he had been stopped, and when he replied that he did not, opened the door, pulled him out, threw him against the side of the vehicle, and handcuffed him. Meanwhile, the driver's wife sat quietly in the passenger's seat. She became frightened by the officers' behavior, so she called 911 on her cell phone. During her conversation with a 911 operator, an officer "yanked open" her door and yelled, "Get off the phone." The woman replied that she was frightened and wanted to stay on the phone with the 911 operator. The officer again ordered her to get off of the phone, to which she replied again that she was frightened. Without another word, the officer applied the prongs of his taser to the woman's upper right arm, grabbed her phone and some of her hair, and threw the phone out of the driver's side door onto the shoulder of the road. The officer grabbed her right arm and pulled her out of the car, bending her arm behind her back. A second officer bent her left arm behind her back, and the officers escorted her to a police car, lifting her up by her arms along the way. She was then handcuffed and placed inside the car. Upon those facts, the Eighth

23

Circuit was not convinced that the officer's use of force was objectively reasonable as a matter of law. Id. at 494-96. The court reasoned that the woman's conduct did not amount to a severe or violent crime because she was merely suspected of an open bottle violation for some empty glasses in her seat. Id. at 496 The court further reasoned that the woman posed a minimal safety threat to the officers and was not actively resisting arrest or attempting to flee. Id. at 497.

In contrast to Brown, in which the plaintiff's crime was non-violent, she did not present a danger to the officer, and she was not resisting arrest, plaintiff's crime was violent, he presented a serious danger to everyone in the ambulance, and he was actively resisting arrest. The Court believes that this case is more similar to Cook than Brown, and given the similar nature of the forces used and the similar injuries, the Court believes that this case presents an even more compelling case for summary judgment than Cook. With regard to the taser and physical force, unlike the husband in Cook who was merely yelling and took one step towards the officer, plaintiff had assaulted the paramedics and officers and was continuing to assault them prior to the use of the baton and taser. Moreover, the officer in Cook deployed his taser in dart mode, while defendants used the taser against plaintiff in stun mode, which, as noted previously, is a less severe form of force. See Brooks, 599 F.3d at 1026. And, with regard to the use of pepper spray, the Eighth Circuit has previously held that it is

24

reasonable to deploy pepper spray, in cases involving only minor crimes, fear of danger, or suspects who are not actively resisting or attempting to flee. Lawyer v. City of Council Bluffs, 361 F.3d 1099, 1105 (8th Cir. 2004). Thus, in this case, which involves violent crime, clear danger to the officer, and a resisting suspect, the use of pepper spray was certainly reasonable as a matter of law.

With regard to plaintiff's allegations that after he had been subdued defendants made snide remarks like "man, this guy just won't die," such facts concern defendants' motivations and intent. As stated previously, the Court must look only to the objective reasonableness of the force used in light of the facts and circumstances. See Graham, 490 U.S. at 397. "[T]he officers' evil intentions, assuming [plaintiff] could establish them at trial, are not relevant to a fourth amendment claim of excessive force." Foster, 914 F.2d at 1082. Thus, defendants' snide remarks cannot make unreasonable their otherwise objectively reasonable use of force.

## III. Conclusion

While plaintiff attempted to create an issue of fact by swearing that he was tasered after he was handcuffed and subdued, this testimony contradicted his previous sworn statement that he did not regain coherency until after he had been tasered. Thus, the only competent evidence of the events that took place prior to

plaintiff regaining coherency is the testimony of the paramedics and defendants, who all testify that defendants' uses of force ceased when plaintiff's resistance ceased. Accordingly, the Court finds that the force used against plaintiff under the circumstances was objectively reasonable as a matter of law, and summary judgment will be granted in defendants' favor.

Accordingly, for the above stated reasons,

**IT IS HEREBY ORDERED** that defendants' motion to strike [Doc. #25] is granted in part, in that plaintiff's evidence concerning events that occurred prior to his regaining coherency is struck, and denied in part, in that the remainder of his evidence is not struck.

**IT IS FURTHER ORDERED** that defendants' motion to strike [Doc. #27] is denied.

**IT IS FURTHER ORDERED** that defendants' motion to strike [Doc. #34] is granted.

**IT IS FURTHER ORDERED** that defendants' motion for summary judgment [Doc. #17] is granted, and a corresponding judgment will issue this day.

Dated this __6th__ day of July, 2010.

/s/Donald J. Stohr
UNITED STATES DISTRICT JUDGE